**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HENRY FORD ALLEGIANCE HEALTH<br>205 N East Ave<br>Jackson, MI 49201<br><br>        Plaintiff,<br><br>    v.<br><br>ALEX M. AZAR II, in his official capacity as SECRETARY of the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, S.W. Washington, DC 20201,<br>        Defendant. | Civil Action No. 19-cv-2234 |

**COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY ACTION AND FOR SUMS DUE UNDER THE MEDICARE ACT**

**I. INTRODUCTION**

1.     This is an action for sums due under the Medicare Act, and for judicial review under the Administrative Procedure Act, of a May 30, 2019 final adverse decision of the Department of Health and Human Services' ("HHS's" or "Defendant's") Provider Reimbursement Review Board (the "Board") unfavorable to the Plaintiff Henry Ford Allegiance Health ("Plaintiff', or the "Hospital").

2.     In its request for hearing, the Hospital sought Board review of the Centers for Medicare & Medicaid Services' ("CMS's") erroneous calculation of the Hospital's Per-Resident Amount ("PRA"). This calculation resulted in the Hospital erroneously and unfairly receiving Medicare reimbursement payments for its graduate medical education ("GME") program expenses at a lower rate than the rate at which the Hospital is entitled to be reimbursed as a matter of law.

3. Following a hearing on the record, the Board erroneously, arbitrarily, and capriciously determined that CMS's calculation of the PRA should be upheld. Reversal by this Court is warranted. On judicial review, this Court should hold that: (a) applicable statutes and regulations require that the Hospital's PRA be calculated based on "comparable programs" as set forth in 42 U.S.C. § 1395ww(h)(2)(F); (b) the Board should have determined that CMS regulations require the Hospital's PRA to be calculated using the most recently settled cost reports of other hospitals in the relevant geographic area; and (c) the Hospital is entitled to a permanent revision of its PRA from its fiscal year ("FY") 2014 onward, including reimbursement of sums due at the correct reimbursement rate as a matter of law.

## II. NATURE OF SUIT

4. The Hospital is an acute care hospital located in Jackson, Michigan. It became a teaching hospital in July, 2013 (the beginning of its 2014 fiscal year).

5. The Medicare program, administered by CMS through a number of intermediary contractors, pays teaching hospitals for a portion of the costs associated with training medical residents.

6. Medicare's payment formula uses three factors: the PRA, the number of full-time equivalent ("FTE") residents the hospital trains, and the hospital's Medicare "patient load" (expressed as a percentage of the hospital's total patient population). Multiplying these three factors together yields a hospital's annual direct GME ("DGME") reimbursement.

7. For hospitals that newly become teaching hospitals, such as the Hospital, the Medicare statute requires that HHS establish the Hospital's PRA "based on approved FTE resident amounts for comparable programs." 42 U.S.C. § 1395ww(h)(2)(F).

8. Medicare calculates a new teaching hospital's PRA based on the lower of a) that hospital's actual reported costs for training residents in its "base year," or b) the "updated weighted average mean value" of all other teaching hospitals in that hospital's geographic area. 42 C.F.R. § 413.77(e)(1).

9. In general, the relevant geographic area for this calculation is known as a "geographic wage area," which is understood to consist of a metropolitan area delineated as such by the Office of Management and Budget. In this case, the applicable "geographic wage area" consists of the Jackson, Michigan core-based statistical area.

10. However, if there are fewer than three teaching hospitals in the "geographic wage area," CMS regulations specify that the calculation should be based on all teaching hospitals in the "census region," which is defined by the Office of Management and Budget and typically consists of several states. 42 C.F.R. § 413.77(e)(1)(iii). In this case, the applicable "census region" is a five-state area that includes Illinois, Indiana, Ohio, Michigan, and Wisconsin.

11. When the Hospital's PRA was being determined, there were fewer than three teaching hospitals in the Hospital's geographic wage area. CMS's contractor recognized that there were fewer than three teaching hospitals in the Hospital's geographic wage area and then attempted to implement an alternative calculation, as required by regulation. However, CMS's contractor did not ostensibly use current information in calculating the census region PRA. Rather, its analysis was based on an artificially low calculation.

12. Although not specified in its workpapers, CMS's contractor apparently relied on an internal bulletin from 1999 (the "Bulletin") to determine the census region PRA. Exhibit A. Pursuant to its interpretation of the Bulletin, CMS's contractor used census region data from 1996 and updated it

for inflation. In its briefing before the Board, CMS's contractor first introduced the Bulletin as an exhibit. The Hospital had no notice from CMS or its contractor of that Bulletin prior to that time.

13. Notwithstanding that the Bulletin had not undergone notice and comment rulemaking or ever been included or referenced in any Federal Register preamble or CMS manual, the Board upheld the Bulletin as supporting the PRA calculation proposed by CMS's contractor.

14. The Bulletin is inconsistent with existing regulations that direct CMS to use the "most recently settled cost reports" of other hospitals in the Hospital's geographic area. 42 C.F.R. § 413.77(e)(1)(ii)(B).

15. HHS's improper calculation of the Hospital's PRA harms the Hospital because it ignores that comparable programs are reimbursed far higher than the Hospital for DGME. In fact, of the 244 teaching hospitals in the Hospital's census region, only 64 (just 26.2%) were not affected by a substantive change between 1998 and 2012 — the vast majority of which were increases in PRAs. This has resulted in a legally cognizable injury in fact because the Hospital will receive DGME reimbursement from Medicare at reduced rates. This rate carries forward to all future years without recalculation. The Hospital is entitled to have its PRA recalculated in accordance with the applicable statute and regulations and to receive reimbursement at the correct rate.

## III. PARTIES

16. The Plaintiff, Henry Ford Allegiance Health, an acute care hospital located in Jackson, Michigan that participates in the Medicare program (provider number (23-0092).

17. Defendant Alex Azar is Secretary of the United States Department of Health & Human Services ("HHS"), the federal agency that administers the Medicare program. References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

18.     CMS is a component of HHS with responsibility for the day-to-day operation and administration of the Medicare program, including calculations of a hospital's DGME payments.

**IV. JURISDICTION AND VENUE**

19.     This Court possesses subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Medicare Act, title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq.

20.     Jurisdiction is proper under 42 U.S.C. §§ 1395oo(a)(1)(A)(ii) and 1395oo(f)(1).

21.     Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

22.     The Hospital timely seeks judicial review of a final agency decision for which no further administrative review is available, and the Hospital has exhausted administrative remedies.

23.     The Hospital possesses statutory standing under 5 U.S.C. § 702, Article III standing, and is within the relevant zone of interests protected by the Medicare statute because the Hospital is aggrieved by the final decision of the Board and has suffered cognizable legal injury because it is entitled to receive higher Medicare reimbursement rates than the rates it receives as a result of CMS's erroneous calculation of its PRA and the Board's erroneous refusal to grant the Hospital's relief from CMS's erroneous PRA calculation.

**V. BACKGROUND OF DGME REIMBURSEMENT**

24.     The PRA is a critical component of Medicare DGME reimbursement. The formula for determining this payment amount uses three components: the PRA, the hospital's Medicare patient load, and the number of full-time equivalent ("FTE") residents the hospital trains. Multiplying these three factors together yields a hospital's annual DGME reimbursement. 42 C.F.R. § 413.76.

25. Once the PRA is calculated, it is not subject to recalculation, but is subject to certain updates, such as an annual increase due to changes in the consumer price index for urban areas. 42 C.F.R. § 413.77(c).

26. Additionally, hospital PRAs were subject to certain floors and ceilings between 2001 and 2013. 42 C.F.R. § 413.77(d). Congress created these floors and ceilings through the enactment of the Balanced Budget Refinement Act of 1999 (Pub. L. 106-113, the "BBRA") and made modifications to these provisions in the SCHIP Benefits Improvement and Protection Act of 2000 (Pub. L. 106-554, "BIPA").

27. Pursuant to these two laws, a PRA floor remained in effect for 2001 and 2002, which resulted in the increase of all existing hospital PRAs that were at less than 70% in 2000 and 85% in 2001 of the "locality-adjusted national average PRA." 42 C.F.R. §§ 413.77(d)(2)(iii)(A)(1) and (2). For the Hospital's census region, this had the effect of raising the majority of the teaching hospitals' PRAs.

28. Teaching hospitals established after 2002, however, did not benefit directly from the PRA floor.

29. Nevertheless, for new teaching hospitals, a calculation is performed that is intended to ensure that their PRAs are in line with the PRAs of other hospitals in their geographic area. Specifically, the PRA for new teaching hospitals is based on the lower of 1) the teaching hospital's actual costs for GME in the base year, or 2) a PRA upper limit, which is the "updated weighted average mean value" of all other teaching hospitals in a certain geographic area. 42 C.F.R. § 413.77(e)(1).

30.     If a teaching hospital is located in a geographic wage area in which three or more existing teaching hospitals are also located, the PRA upper limit is based on all teaching hospitals' PRAs in that geographic wage area. 42 C.F.R. § 413.77(e)(1)(ii)(B).

31.     If there are fewer than three existing teaching hospitals, the PRA upper limit is based on all teaching hospitals' PRAs in the hospital's census region. 42 C.F.R. § 413.77(e)(1)(iii).

32.     The process in the regulation for calculating the "updated weight average mean value" has been modified several times. Although the current census region calculation and the geographic wage area calculation are in separate paragraphs, they were historically combined into one paragraph. Furthermore, even though now the methodologies are separated into two paragraphs, the census region PRA calculation cannot be adequately interpreted without referencing the geographic wage area calculation.

33.     Prior to 1997, the applicable regulation stated as follows (42 C.F.R. § 413.86(e)(4)(B)v(1996)):

> [The PRA is the lower of actual costs per resident or the] mean value of per resident amounts of hospitals located in the same geographic wage area, as that term is used in the prospective payment system under part 412 of this chapter, for cost reporting periods beginning in the same fiscal years. If there are fewer than three amounts that can be used to calculate the mean value, the intermediary must contact HCFA Central Office for a determination of the appropriate amount to use..

34.     In 1997, the text was changed to the following (42 C.F.R. § 413.86(e)(4)(B) (1997)) (emphasis in bold):

> [The PRA is the lower of actual costs per resident or the] mean value of per resident amounts of hospitals located in the same geographic wage area, as that term is used in the prospective payment system under part 412 of this chapter, for cost reporting periods beginning in the same fiscal years. If there are fewer than three amounts that can be used to calculate the mean value, **the calculation of the per resident amount includes all hospitals in the hospital's region as that term is used in § 412.62(f)(1)(i).**

35. The regulation was modified in 2003 into the version effective during the Hospital's PRA base year (2014). CMS, due to perceived confusion in the language "beginning in the same fiscal years," modified the text to read "most recently settled cost reports." 67 Fed. Reg. 49981, 50068-069 (Aug. 1, 2002). CMS also separated the census region PRA cap calculation into its own provision without further explanation.

36. The version of the regulation applicable to the Hospital's base year reads (42 C.F.R. § 413.77(e)(1):

> (ii) Except as specified in paragraph (e)(1)(iii) of this section -
>
> . . .
>
> (B) For base periods beginning on or after October 1, 2002, the updated weighted mean value of per resident amounts of all hospitals located in the same geographic wage area is calculated using all per resident amounts (including primary care and obstetrics and gynecology and nonprimary care) and FTE resident counts from the most recently settled cost reports of those teaching hospitals.
>
> (iii) If, under paragraph (e)(1)(ii)(A) or paragraph (e)(1)(ii)(B) of this section, there are fewer than three existing teaching hospitals with per resident amounts that can be used to calculate the weighted mean value per resident amount, for base periods beginning on or after October 1, 1997, the per resident amount equals the updated weighted mean value of per resident amounts of all hospitals located in the same census region as that term is used in subpart D of part 412 of this subchapter.

37. Although the census region PRA calculation is now separated from the geographic wage area calculation, it nevertheless continues to rely upon the specific instructions of the geographic wage area calculation to effectuate a proper calculation, including use of the "most recently settled cost reports."

## VI. BACKGROUND ON THE BOARD'S DECISION

38. On May 30, 2019, the Board issued its decision, which represents the final agency action of HHS. In its decision, the Board did not address whether the Hospital's PRA was being compared to PRAs of "comparable programs" as set forth in the Medicare Act. Nor did the Board explain

how the census region PRA regulatory provision sufficiently describes the calculation methodology standing on its own. Rather, the Board focused solely on deciphering whether CMS's decision with respect to the Provider's PRA calculation was intentional or merely a mistake. In that regard, the Board claimed to have been "convinced" that "CMS knowingly decided to compute" the census region PRA differently from the geographic wage area PRA. Exhibit B at 6.

39. As support for this finding, the Board cited a 2002 Federal Register preamble where CMS noted a concern with administrative burdens associated with the PRA calculation for reasons unrelated to the census region calculation. Exhibit B at 6 (citing 67 Fed. Reg. 31404, 31467 (May 9, 2002)). Since, the Board then conjectures, disregarding the Bulletin would also result in administrative burdens for the census region calculation, CMS's current approach must be intentional. *Id*. at 7. In other words, the Board's decision is based on the inference of CMS's intent, rather than any statements CMS has actually made about the census region PRA calculation.

## VII. THE BOARD'S DECISION IS INCONSISTENT WITH APPLICABLE STATUTES AND REGULATIONS AND IS ARBITRARY AND CAPRICIOUS

40. The Hospital is challenging the validity of HHS's final agency action – the Board decision. For the following reasons, the Hospital asserts that the Board decision was decided in a manner that is inconsistent with applicable statutes, inconsistent with applicable regulations, and is otherwise arbitrary and capricious, particularly as it relies upon the Bulletin.

41. The applicable statute requires that the Hospital's PRA be based on "comparable programs." It was not.

42. The applicable regulation requires that the Hospital's PRA be based on other teaching hospitals' "most recently settled" cost reporting periods. It was not.

43. Reliance on the Bulletin is arbitrary and capricious because the document is outdated and never promulgated pursuant to notice and comment rulemaking. Indeed, the applicable regulation

underwent modification after the date of the Bulletin, and no reference was ever made to the existence of the Bulletin, much less its continued force and effect after the change in regulation.

### i. The Statute Requires that the Hospital's PRA Be Based on "Comparable Programs."

44. The Board's decision does not meet the statutory requirement to use "comparable programs" as the benchmark for evaluating the Provider's PRA because it uses a data set that predates statutorily-mandated PRA floors.

45. The Bulletin approved by the Board uses outdated data, sometimes back from 1986, trended forward solely by an inflation factor, without regard to whether new teaching hospitals opened, existing teaching hospitals closed, existing programs increased or decreased their resident counts, or CMS or Congressional policies changed the payment rates or methodology for other teaching hospitals. Notably, all of these events occurred in the intervening period between 1986 and 2013.

46. By statute, the Hospital's "comparable programs" benefitted from a nationwide PRA floor in 2001 and 2002. Specifically, the enactment of the Balanced Budget Refinement Act of 1999 (Pub. L. 106-113) ("BBRA"), which was enacted on November 29, 1999, codified a PRA floor in Section 1886(h)(2)(D)(iii) of the Act. In that statutory section, the PRAs for all hospitals were subject to a floor. For cost reporting periods beginning in FFY 2001, the floor was 70% of a locality adjusted national PRA. For FFY 2002, the floor was set at 85% of the locality adjusted national PRA. In 2014, which is the Hospital's PRA base year, "comparable programs" would have benefitted from that floor and the weighted average PRA for the Hospital's census region increased.

47. Failure to take into account major changes to the peer hospital pool, as well as changes to the PRA data, violates the plain meaning of the statute, rendering the calculation methodology invalid. *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984) (requiring that

an agency give effect to the unambiguously expressed intent of Congress in drafting a statute when establishing or applying that agency's regulations to a regulated entity).

48. The Hospital provided substantial, unrefuted analysis to the Board that, in fact, the "comparable programs" in the Hospital's census region were almost entirely different from the hospitals whose data had been used to create the Bulletin.

49. "Comparable programs" is not a defined term, but has a plain meaning – that a new teaching hospital should have a PRA set in a range similar to its competitors so that it may compete for medical residents in the relevant geographic area.

50. The Board, in ignoring the Hospital's analysis and instead relying on an outdated Bulletin, did not abide by the plain meaning of the term "comparable programs" and therefore violated the statute.

### ii. The Regulation Requires that the Hospital's PRA Be Based on Peer Hospitals' Most Recently Settled Cost Reports

51. The relevant regulation governing PRA calculations has been subject to various modifications over time.

52. In 2002, the single calculation was bifurcated into two because CMS believed there was confusion about the language "beginning in the same fiscal year" and CMS had to create a pre- and post-October 1, 2002 framework. CMS did not provide any explanation on why the census region PRA calculation was separated, or whether it intended to apply a different calculation methodology when using the census region for peer hospital data.

53. In fact, the census region calculation continues to rely on the geographic wage area calculation to fill in crucial missing details. For example, the regulations only contain a single timing element within the geographic wage area calculation – nothing similar is present in the

census region calculation. As referenced above, the only time period referenced for baseline data is to the "most recently settled cost reports."

54. Similarly, the census region calculation uses the term "updated," which implies an intent by CMS to ensure that comparable data is provided.

55. The Bulletin provides an "update" only in applying the "GME Update Factor" to the FY 1998 census region data. However, the substantial changes that occurred as a result of the PRA floor and the evolution of many teaching hospitals' programs renders the Bulletin's data obsolete and its approach inadequate.

56. Failure to take into account those changes therefore violates the regulation's plain meaning and manifest intent that only updated, accurate data should be used for calculating a new teaching hospital's PRA cap. The Board's decision to create a new methodology that ignores CMS's intent at the time of promulgating its regulation is invalid. CMS cannot simply make decisions at will when they do not line up with its previously articulated policies. See, e.g., *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (citing *Gardebring v. Jenkins*, 495 U.S. 415, 430 (1988), and stating that an agency's interpretation is not to be upheld where an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation").

### iii. The Board's Reliance on the Bulletin Is Arbitrary and Capricious

57. The Bulletin is an internal document that has never been released to the Hospital or the public at large.

58. Based on the date listed on the document, the Bulletin was issued on May 14, 1999. This is six months prior to the enactment of the BBRA, which set the PRA floors. It is also prior to the

regulations issued by CMS in 2002 that separated the census region calculation from the geographic wage area calculation.

59. CMS did not anticipate, and had no way of anticipating, how these changes would affect the PRA landscape and cannot align the data in the Bulletin with these changes.

60. The Board, with access to the Bulletin dataset and the dataset for the most recent cost reporting periods for the peer group hospitals, was able to consider each dataset and inexplicably believes that the Bulletin is reasonably reliable to represent "comparable programs."

61. The Board offered no explanation why the current cost report dataset provided as part of the Hospital's appeal was not substantially more accurate or how, even under *Chevron* Step II, the Bulletin's dataset could be viewed as a reasonable interpretation of the underlying statutory requirement.

62. Without such explanation, the Board's reliance on the Bulletin is arbitrary and capricious and should not be permitted.

### iv. The Bulletin Was Not Appropriately Promulgated and May Not Be Relied Upon

63. The Bulletin at issue was not generally available to the public during the Hospital's base year. According to the document, the Bulletin was posted on the "BPO Bulletin Board," which the Hospital presumes is some type of internal message board at CMS or its Regional Offices that Medicare contractors had access to (given the time period at issue, it is unlikely that the BPO Bulletin Board was available on the internet).

64. The Medicare Act requires the government to provide the public with advance notice and a chance to comment on any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing ... the payment for services." 42 U.S.C. § 1395hh(a)(2).

65. Use of the Bulletin and reliance on FFY 1998 data as the source of the census region PRA calculation is a change in the substantive legal standard governing payment of services.

66. Regardless of whether reliance on the Bulletin and FFY 1998 data could be treated as interpretive under the Administrative Procedure Act, under the Medicare Act "'statements of policy' . . . can establish or change a 'substantive legal standard.'" *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1811 (2019).

67. The Bulletin was never announced in the Federal Register nor was it distributed through CMS manuals. Because of this, the existence of the Bulletin was not reasonably knowable to the Hospital at the time it made the decision to begin training residents.

68. Further, no other CMS guidance or pronouncement references or even acknowledges the existence of the Bulletin. After the posting of the Bulletin, CMS issued over the years several discussions in Federal Register preamble concerning the calculation of the PRA. None of these discussions ever made mention of the Bulletin or otherwise rely on FFY 1998 data as the source of the census region PRA calculation.

69. "Notice and comment gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision." *Allina Health Servs.*, 139 S. Ct. at 1816. The Hospital was given no such warning.

70. The post hoc application of a private policy decision violates all notions of open and fair rulemaking. Failure to publish the Bulletin thus constitutes impermissible retrospective rulemaking. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (stating that, when analyzing retrospective rulemaking, retroactivity is disfavored in the law). It also violates the Hospital's due process right to notice of the rules that will be applied to it. *See, e.g., Grancare,*

*Inc. v. Shalala*, 93 F.Supp.2d 24, 31 (D.D.C. 2000) (finding that a cost report adjustment based on an interpretation of Medicare policy that was not fairly inferable from the applicable regulation and Manual provision could not be sustained).

**VIII. STANDARD OF REVIEW AND ASSIGNMENT OF ERROR**

71. Section 1878(f) of the Social Security Act, 42 U.S.C. § 1395oo(f) provides for review of Board's decisions below and HHS's determination of the appropriate PRA at issue pursuant to the applicable provisions of the APA. The applicable provisions of the APA also require a reviewing court to set aside agency action that is found to be contrary to law, arbitrary, capricious, unsupported by substantial evidence, in excess of statutory authority or otherwise not in accordance with law. 5 U.S.C. § 706.

72. This Court has jurisdiction to decide the validity of HHS's determination of the Hospital's PRA pursuant to 42 U.S.C. § 1395oo(f)(1) because the Board made a final decision in this matter.

**COUNT I**
**(ADMINISTRATIVE PROCEDURE ACT - 5 U.S.C. § 701, et. seq.)**

**HHS, THROUGH CMS, ERRONEOUSLY, ARBITRARILY, AND CAPRICIOUSLY DETERMINED AN INAPPROPRIATE PRA FOR THE HOSPITAL**

73. The Hospital hereby incorporates by reference the foregoing paragraphs.

74. The Board's PRA determination is contrary to the statute's plain language and implementing regulations because the Board failed to assign the Hospital a PRA that is based on comparable programs and relies on data from the most recently settled cost reporting periods.

75. Because HHS did not follow the plain meaning of the statute implementing the PRA calculation, its decision is arbitrary and capricious and otherwise contrary to law.

76. Because no methodology for calculating the census region PRA has been promulgated in the Federal Register or otherwise that supports HHS's calculation of the Hospital's PRA, the decision violates the notice and comment rulemaking found in 5 U.S.C. § 553. It is therefore arbitrary and capricious and otherwise contrary to applicable law.

77. The Hospital is aggrieved by the foregoing final agency determination.

78. The Hospital has exhausted all available administrative remedies.

79. The Hospital is entitled to reversal of the final adverse determination of HHS through CMS.

## COUNT II

### (ADMINISTRATIVE PROCEDURE ACT - 5 U.S.C. § 701, et. seq.)

### HHS, THROUGH CMS, ERRONEOUSLY, DETERMINED A PRA FOR THE HOSPITAL THAT IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

80. The Hospital hereby incorporates by reference the foregoing paragraphs.

81. The Board's PRA determination is unsupported by substantial evidence because the Board relied on an obsolete and irrelevant dataset to set the Hospital's PRA.

82. Because HHS ignored or misapplied relevant, recent cost reporting data that supports that the Hospital's peer hospitals were paid at a substantially higher rate, the determination violates the APA because it is not supported by substantial evidence.

83. The Hospital is aggrieved by the foregoing final agency determination.

84. The Hospital has exhausted all available administrative remedies.

85. The Hospital is entitled to reversal of the final adverse determination of HHS through CMS.

## RELIEF REQUESTED

For all the foregoing reasons, the Hospital respectfully requests that this Court:

 A. Declare invalid HHS's determination of the Hospital's PRA;

B. Remand to HHS with instructions to:

i) Recalculate the Hospital's PRA from its base year forward using data from the most recently settled cost reporting periods of comparable programs; and

ii) Pay Hospital all sums due as a result of that recalculation for all payments incorrectly paid at the reduced rate, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2); and

C. Grant such other and further relief as the Court deems just and proper.

Dated: July 26, 2019

/s/ Andrew D. Ruskin
Andrew D. Ruskin (DC Bar No. 457824)
MORGAN, LEWIS & BOCKIUS, LLP.
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5960 (phone)
(202) 739-3001 (fax)
Andrew.ruskin@morganlewis.com